# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| ACCEPTANCE INDEMNITY INSURANCE COMPANY,<br>    Plaintiff, | §<br>§<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. H-04-2222 |
| MELVIN ALFREDO MALTEZ *et al.*,<br>    Defendants. | §<br>§<br>§ | |

## <u>MEMORANDUM AND ORDER</u>

Pending before the court in this declaratory judgment action is a Motion for Entry of Judgment [Doc. # 100] filed by Defendant Melvin Alfredo Maltez ("Maltez") and Defendant/Counter-Plaintiff Associated Automotive, Inc. ("AAI"). Plaintiff Acceptance Indemnity Insurance Company ("Acceptance Indemnity") has responded [Doc. # 107], Maltez and AAI (collectively, "Defendants") have replied [Doc. # 109], and Acceptance Indemnity has filed a surreply [Doc. # 110]. Upon review of the parties' submissions, all pertinent matters of record, and applicable law, the Court concludes that Defendants' Motion for Entry of Judgment should be **denied**. Instead the Court will enter judgment in Plaintiff's favor for reasons explained herein.

## I.      FACTUAL BACKGROUND

The factual record is set out in more detail in the Court's Memorandum and Order of August 28, 2007 [Doc. # 57].  Briefly, AAI, the insured party in this case, operates as an automotive repair business owned by Cal and Shirley Enderli.  In May 2003, the Enderlis' son, Cal Enderli, Jr., purchased AAI's salvage operations and began operating as Associated Automotive Salvage ("Salvage"), renting a portion of the AAI premises and sharing various administrative operations with AAI.

While working on the AAI/Salvage premises in August 2003, Defendant Maltez was injured operating a torch to remove a part from a vehicle.  Maltez subsequently sought recovery for his injuries in state court and was awarded $150,000 plus interest and costs.[1]  The judgment was specifically entered against Cal Enderli, Jr., d/b/a Salvage.  However, the state court jury also found that Salvage operated as a "single business enterprise" ("SBE") with AAI.   Accordingly, the state court entered judgment that AAI was jointly and severally liable for Maltez's damages by virtue of the SBE relationship.[2]

AAI  sought indemnification from Acceptance Indemnity, which had issued to AAI a general liability policy in effect at the time of Maltez's injury.  The policy provided  that Acceptance Indemnity would "pay all sums an 'insured' legally must

---

[1]     The state court lawsuit is *Maltez v. Associated Automotive, Inc., et al.*, No. 2004-01878, in the 80th Judicial District for Harris County, Texas.

[2]     *See* Motion for Entry of Judgment [Doc. # 100], Exh. 4: "State Court Judgment."

pay as damages because of 'bodily injury' . . . to which this insurance applies caused by an 'accident' and resulting from 'garage operations.'" However, the policy excluded from such coverage injuries sustained by an "employee . . . arising out of and in the course of employment by the insured."[3]   Because of the exclusion for employee injuries, and because AAI was deemed liable for Maltez's judgment only by virtue of the SBE finding, Acceptance Indemnity sought a declaration that no coverage was due.[4]  During the course of this litigation, several motions for summary judgment were denied on the grounds that material questions of fact remained that could preclude the Court's ruling on an issue of first impression, namely, whether, under Texas law, an insurer is legally obligated to indemnify a judgment against a component of an SBE where one entity of the SBE is a named insured, but the entity against which judgment was entered is not.  Among these open questions of fact was whether Maltez was an employee of AAI at the time of his accident, in which case, his

---

[3]   Defendants' Reply to Plaintiff's Response to Motion for Entry of Judgment ("Defendants' Reply") [Doc. # 109], Exh. D: "Commercial Auto Coverage Part-Garage Policy, No. CG00031677," at 2, 4.  (This document is not separately paginated.  All references are to the page numbers assigned by the Court's electronic docketing system.)

[4]   Acceptance Indemnity originally filed this suit while the state court case was pending, seeking a declaration that it had no duty to defend AAI in the underlying state suit. The Court found that Acceptance Indemnity was obligated to provide a defense and stayed the federal case pending resolution of the state court lawsuit. *See* Memorandum and Order of March 22, 2005 [Doc. # 29], at 12.

claim would clearly be excluded from coverage under the Acceptance Indemnity policy.

The case was tried to a jury.  The Court submitted three factual questions:

(1)     Was Melvin Maltez an employee of Associated Automotive, Inc., d/b/a Associated Car Pro, when he was injured on August 7, 2003?

(2)     Did Malvin Maltez's injury on August 7, 2003 result from "garage operations" [as defined by the Acceptance Indemnity policy]?

(3)     Did Malvin Maltez's injury on August 7, 2003 result from the "garage operations" of [AAI]?[5]

The jury determined that Maltez was not an employee of AAI, but that his injury was the result of AAI's garage operations.[6]  At the conclusion of the trial, the Court ordered post-trial briefing on whether the jury's finding that Maltez was injured while engaged in garage operations *for AAI* was supported by the evidence.  The Court also requested briefing on the unresolved legal questions, specifically, whether and how the jury verdict requires indemnification by Acceptance Indemnity of the state court judgment, including any public policy arguments bearing on this issue.  These matters have been fully briefed and are ripe for adjudication.

---

[5]     Jury Verdict [Doc. # 98].

[6]     *See id.*

## II.   LEGAL STANDARDS

### A.   Judgment as a Matter of Law

Judgment as a matter of law is proper when "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party" on the issues on which it prevailed. *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir.1997) (quoting FED. R. CIV. P. 50(a)); *see also Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 582–83 (5th Cir. 2002).  This occurs when the "facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001) (quoting *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000); *see also Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc).

A review of the record must be performed in a manner in which all reasonable inferences are drawn in favor of the nonmoving party, without making credibility determinations or weighing the evidence. *Laxton v. Gap, Inc.*, 333 F.3d 572 (5th Cir. 2003); *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 761 (5th Cir. 2002); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir. 1997).  The evidence, however, must be more than a mere scintilla and must be sufficient enough "that a jury will not ultimately rest its verdict on mere speculation and conjecture." *See Anthony*, 284 F.3d at 583; *Gulf Coast Real Estate Auction Co. v. Chevron Indus., Inc.*, 665 F.2d

574, 577 (5th Cir. 1982).  The Court is also to give credence to "'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'"  *See Wallace*, 271 F.3d at 219 (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000)).

### B.    Interpretation of Insurance Policies

Interpretation of an insurance policy is a question of law.  In a diversity case such as this, the Court applies Texas law to construe the policy.  *See Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998); *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991).  Under Texas law, the meaning of an insurance policy is to be determined by the standards applicable to contracts generally.  *See Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000); *Cicciarella v. Amica Mutual Ins. Co.*, 66 F.3d 764, 767–68 (5th Cir. 1995); *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740–41 (Tex. 1998); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987).  In construing a contract for insurance, a court's "primary goal . . . is to give effect to the written expression of the parties' intent." *Balandran*, 972 S.W.2d at 741; *see also TIG Specialty Ins. Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365, 369 (5th Cir. 2004) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)).

Where "a written contract is so worded that it can be given a definite or certain legal meaning," then it is unambiguous. *Kelley-Coppedge, Inc. v. Highlands, Ins. Co.*,

980 S.W.2d 462, 464 (Tex. 1998).   A court may not vary the terms of an unambiguous contract, which are to be given their plain and ordinary meaning. *See Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 329 (5th Cir. 2001) (citing *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins.*, 99 F.3d 695, 700 (5th Cir. 1996)); *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984).   "A contract is ambiguous only 'when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning.'" *Cicciarella*, 66 F.3d at 768 (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).   However, "[t]he fact that the parties disagree as to coverage does not create an ambiguity." *Sharp v. State Farm Fire & Cas. Ins. Co.*, 115 F.3d 1258, 1261 (5th Cir. 1997); *Forbau*, 876 S.W.2d at 134.   "While parol evidence of the parties' intent is not admissible to create an ambiguity . . . the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists." *Balandran*, 972 S.W.2d at 741 (citing *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995)); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).   "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589; *see also Cicciarella*, 66 F.3d at 768; *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 917 (Tex. App.—Fort Worth 1988, writ denied).

If a court finds that terms in an insurance contract are ambiguous and subject to more than one reasonable interpretation, the relevant language is to be "interpreted in favor of coverage for the insured." *Lambrecht & Assocs., Inc. v. State Farm Lloyds*, 119 S.W.3d 16, 20 (Tex.App.—Tyler 2003, no pet.) (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)); s*ee also Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co., Inc.*, 112 F.3d 184, 186 (5th Cir. 1997); *Tex. Dep't of Hous. & Cmty. Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 928 (5th Cir. 1995); *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).  Thus, exceptions and limitations in a policy are construed strictly against the insurer and the court is to "'adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'" *Canutillo*, 99 F.3d at 701 (quoting *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987)).

Finally, regardless whether a contract is deemed ambiguous, where parties are seeking a declaration regarding coverage under a policy, "the insured bears the burden of showing that the claim against it is potentially within the policy's coverage, [while] the insurer bears the burden of establishing that an exclusion in the policy constitutes an avoidance of or affirmative defense to coverage."  *Canutillo*, 99 F.3d at 701 (citing *Sentry Ins. v. R.J. Weber*, 2 F.3d 554, 556 (5th Cir. 1993)); *see also United Nat'l Ins.*

*Co. v. Hydro Tank, Inc.*, 497 F.3d 445, 448 (5th Cir. 2007) (citing *Lincoln Gen'l Ins.*

*Co. v. Reyna*, 401 F.3d 347, 350 (5th Cir. 2005)).

## III.   <u>ANALYSIS</u>

The Acceptance Indemnity insurance policy purports to provide coverage for

"all sums an 'insured' legally must pay as damages because of 'bodily injury' . . . to

which this insurance applies caused by an 'accident' and resulting from 'garage

operations.'"[7] At issue in this case is the interpretation of two phrases in this

provision.  First, whether damages assessed against an insured must be the result of

*the insured's* garage operations in order to trigger coverage.   Second, whether

coverage is afforded when legal liability is assessed against a named insured, not

because the named insured was at fault for an injury, but because the named insured

operated as an SBE with another entity found to be at fault.  The Court will address

each of these questions in turn.

### A.   <u>Coverage for "Damages Because of 'Bodily Injury' . . . *Resulting from 'Garage Operations'"*</u>

As noted above, coverage under the Acceptance Indemnity policy is provided

when an insured is deemed legally liable for an injury "resulting from 'garage

---

[7]     Defendants' Reply [Doc. # 109], Exh. D: "Commercial Auto Coverage Part-Garage
Policy, No. CG00031677," at 2.

operations.'"[8] "Garage operations" is defined in the policy as "the ownership, maintenance[,] or use of locations for garage business . . . [and] also all operations necessary or incidental to a garage business."[9]   Defendants assert that because this provision fails to state that coverage is provided for those injuries resulting from "your"—meaning AAI's—garage operations, the jury need only have concluded that Maltez was injured in the course of "any" garage operations to trigger coverage under the policy.   Acceptance Indemnity argues that the provision requires that the injury result from the garage operations of the named insured.   Accordingly, the questions whether Maltez's injury resulted from "garage operations" generally, and whether it resulted from the "garage operations of AAI" were submitted to the jury.   The jury answered both questions in the affirmative.

After a careful review of the evidence, the Court concludes that there was insufficient evidence presented at trial that Maltez's injury resulted from AAI's garage operations to sustain the jury verdict.   However, the Court also concludes that the policy does not require that an injury result from the *named insured's* garage operations to trigger coverage.

### 1.    Whether Maltez's Injury "Resulted from" AAI's "Garage Operations"

---

[8]      *Id.* at 2.

[9]      *Id.* at 9.

According to its policy with Acceptance Indemnity, AAI was insured as a business engaged in used car sales.[10]  At trial, Acceptance Indemnity stated that AAI was also operated, and presumably was insured, as a "body shop."[11]  Accordingly, "garage operations" for purposes of the Acceptance Indemnity policy would include "all operations necessary or incidental" to AAI's car sales and body shop business. For an injury to "result from" AAI's garage operations, there must be a sufficient connection between the circumstances giving rise to the injury, and these business operations.

Defendants argue that Maltez's accidental injury "resulted from" the garage operations of AAI, because Salvage's operations were generally "incidental and necessary to [AAI's] garage business," and "Maltez was injured while engaged in Salvage's operations."[12]  Specifically, Defendants argue that because Salvage made payments to AAI for rental space, equipment, and inventory, all of Salvage's activities were "incidental" to AAI's business since Salvage needed to earn money to fulfill its

---

[10]     *See* Plaintiff's Motion for Summary Judgment [Doc. # 41], Exh. A: "Commercial Auto Coverage Part-Garage Policy, No. CG00031677," at 12, 46.  (This document is not separately paginated.  All references are to the page numbers assigned by the Court's electronic docketing system.)

[11]     *See* Transcript of Trial—Feb. 26, 2008, Vol. I [Doc. # 103], at  41.  At trial, AAI's owner, Cal Enderli, Sr., ("Senior") described the company as "automotive-related from storing automobiles, to the repair of automobiles, to the sales of automobiles, and to the selling of parts of automobiles."  *Id.* at 174.

[12]     Defendant's Reply [Doc. # 109], at 7.

obligations to AAI, which in turn used that money to fulfill its own financial obligations.[13]  Defendants' argument misses the point.  AAI and Salvage may have been engaged in operations that were mutually beneficial, both financially and professionally.  However, the question is whether *Maltez's injury* resulted from the garage operations of AAI.  Although Defendants point to trial testimony establishing that many of Salvage's operations were generally beneficial to AAI[14] and that AAI was occasionally a customer of Salvage,[15] they point to no evidence establishing that Maltez's injury itself resulted from AAI's garage operations.

---

[13]     For example, Defendants argue:

> [AAI] owned the lease rights to the property where the accident took place and had obligations to pay rent pursuant to the lease.  Among other ways, [AAI] makes money by collecting rent under its sublease to Salvage for the use of land as a salvage yard.  Maltez's injury happened on that land while it was being used as a salvage yard. Second, as part of the sale of [AAI's] salvage business, Salvage made monthly payments for that inventory . . . .  Salvage also purchased all other wrecked vehicles [AAI] acquired as a result of its storage business.  Maltez's injury resulted while he was removing a part from inventory Salvage purchased from [AAI].  The direct and inferential evidence establishes that Salvage was able to purchase inventory from [AAI] and comply with its payment obligations to [AAI] by removing and selling parts from the vehicles purchased from [AAI].

Defendant's Reply [Doc. # 109], at 8:

[14]     *See* Transcript of Trial—Feb. 26, 2008, Vol. I ("Transcript Vol. I") [Doc. # 103], at 159–65, 178–79, 184, 190–91, 204–05; Transcript of Trial—Feb. 26, 2008, Vol. II ("Transcript Vol. II") [Doc. # 104], at 236–37.

[15]     *See* Transcript Vol. I [Doc. # 103], at 134, 179; Transcript Vol. II [Doc. # 104] at 226.

Maltez was injured while operating a torch to remove a part from a Salvage vehicle.[16]  It is uncontroverted that the part being removed was not for sale to, or use by, AAI, but was for sale to a Salvage customer.[17]  Defendants claim, without citation to any evidence, that the vehicle from which Maltez was removing the part was purchased by Salvage from AAI.  However, even if that is true, Maltez's injury did not result from that transaction.[18]  Similarly, Defendants argue that Salvage agreed to maintain a forklift for AAI in exchange for its shared use[19] and that Maltez was using that forklift when he was injured.[20]  However, this argument lacks substance; Maltez's injury had nothing to do with the forklift, which was operating properly at the time of his accident.[21]  Maltez was injured when a shock absorber exploded while he was using a torch.[22]  The evidence is clear that Maltez's injury was the result of Salvage's distinct garage operations.  In fact, to the extent Defendants argue that Maltez was engaged in work that would bring in income to Salvage that would, at least in part,

---

[16]     *See* Transcript Vol. I [Doc. # 103], at 79.

[17]     *See id.* at 78–79, 84, 140–41; Transcript Vol. II [Doc. # 104], at 212, 226–28.

[18]     *See* Transcript Vol. II [Doc. # 104], at 232–33.

[19]     *See, e.g.*, Transcript Vol. I [Doc. # 103], at 143–44.

[20]     *See* Transcript Vol. I [Doc. # 103], at 85, 97; Transcript Vol. II [Doc. # 104],

[21]     *See* Transcript Vol. I [Doc. # 103], at 86, 97, 144; Transcript Vol. II [Doc. # 104], at 230–31.

[22]     *See* Transcript Vol. I [Doc. # 103], at 54–55, 79, 97.

flow to AAI, it is notable that no witness could testify that the part Maltez was attempting to remove when he was injured was actually ever sold or delivered to a customer.[23]

In addition, Defendants went to great length during the trial to demonstrate that Maltez was employed by Salvage, and that Salvage was a separate and distinct entity from AAI.[24]  Defendants established that on the day of Maltez's accident, his work was being directed by Cal Enderli, Jr. ("Junior"), owner of Salvage, and that Junior—and only Junior—asked Maltez to pull the part.[25]  Indeed, witnesses favorable to the defense were emphatic that AAI had nothing to do with Maltez at the time of his accident.[26]  Defendants also established that AAI, through its owner, Senior, went to great lengths to fully divest itself from Salvage.[27]  While AAI was occasionally a Salvage customer, by Senior's *and* Junior's own admissions, any connection between

---

[23]    *See* Transcript Vol. I [Doc. # 103], at 205–06; Transcript Vol. II [Doc. # 104], at 228.

[24]    *See, e.g.*, Transcript Vol. I [Doc. # 103], at 83–85, 98–100, 109–10, 119–23, 138, 149–55, 168, 182–83, 186–88; Transcript Vol. II [Doc. # 104], at 221–23, 232–33.

[25]    *See* Transcript Vol. I [Doc. # 103], at 96, 100–01, 115, 139, 145–46, 193–94; Transcript Vol. II [Doc. # 104], at 215–16.

[26]    *See* Transcript Vol. I [Doc. # 103], at 96–97, 139, 140–41, 146; Transcript Vol. II [Doc. # 104], at 233, 244–45

[27]    *See* Transcript Vol. I [Doc. # 103], at 128, 131–32, 134, 139, 142, 197–98; Transcript Vol. II [Doc. # 104], at 213–14, 216, 235 (Junior: "[M]y father had made it full and clear that he didn't want anything to do with the salvage yard . . . .")

Salvage and AAI had *no relation* to Maltez's injury.[28]

_____

28      At trial, Senior testified:

> Q:      And the paying of that rent [from Salvage to AAI] didn't have anything to do with making this accident happen, right? . . . With making the accident happen with Mr. Maltez?

> A:      No.

> Q:      And . . . Junior's company . . . also purchased inventory from [AAI], correct? . . . And again, nothing regarding the financial purchase and the inventory had anything to do with this accident, did it?

> A:      No.

> Q:      Just a monetary transaction, correct?

> A:      Monetary transaction.

Transcript Vol. I [Doc. # 103], at 145.

Senior further testified:

> Q:      [T]his money that was coming in from [Salvage], it's fair to say that Mr. Maltez's injures did not result from that money coming into your company, did it? . . . [H]is injuries didn't result from this money coming into [AAI], did it?

> A:      No.

> Q:      And in terms of the work that . . . Mr. Maltez was doing on the day at the time of his injury, that wasn't providing any benefit to [AAI], was it?

> A:      No.  But he – . . . By the sale of that [part] would have given [Salvage] . . . his lump sales funds dollars and cents to meet his obligations that he had.

(continued...)

While it is clear that Maltez was injured while engaged in Salvage's business operations, there is no evidence from which a jury could find that Maltez's injury resulted from AAI's garage operations.  Accordingly, the Court finds as a matter of law, notwithstanding the jury verdict, that Maltez's injury on August 7, 2003 did not result from the garage operations of AAI.

---

[28]    (...continued)

> Q:    [H]is bodily injuries didn't result from the money that you might have realized from the sale of that part, true?
>
> A:    That's true.

*Id.* at 203–04.

At trial, Junior testified:

> Q:    Your paying of rent to your father, though . . . Mr. Maltez' injuries didn't result from those payments, did they?
>
> A:    No, sir.
>
> Q:    Okay.  And they didn't result from the maintenance of the forklift, correct?
>
> A:    No, sir.
>
> Q:    And they didn't result from your buying the inventory, correct?
>
> A:    No, sir.

Transcript, Vol. II [Doc. # 104], at 232–33.

*See also* Transcript Vol. I [Doc. # 103], at 137 ("Q: A customer coming in and asking for a part . . . that had nothing to do with [AAI], right?  Senior: Nothing to do with [AAI].").

2.     **Whether the Policy Requires that Maltez's Injury Result from AAI's Garage Operations**

Even though insufficient evidence was presented at trial that Maltez's injury resulted from *AAI's* garage operations, the Acceptance Indemnity policy does not require such a finding to trigger coverage.  That the jury concluded that Maltez's injury resulted generally from "garage operations"[29] is enough.

In interpreting an insurance policy, the Court is to "read all parts of . . . [the] policy together to ascertain the parties' intent and give effect to all parts, so that none will be rendered superfluous or meaningless."  *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 671 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 192–93 (Tex. 2002); *Forbau*, 876 S.W.2d at 133; *Betco Scaffolds Co. v. Houston United Cas. Ins. Co.*, 29 S.W.3d 341, 344 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).  "'[N]o one phrase, sentence, or section . . . should be isolated from its setting and considered apart from the other provisions.'" *Id.* (quoting *Guardian Trust Co. v. Bauereisen*, 121 S.W.2d 579, 583 (Tex. 1938)).

In this case, the policy language at issue states that coverage will be provided for damages for injuries "caused by an 'accident' and resulting from 'garage

---

[29]     Jury Verdict [Doc. # 98].

operations.'"[30] The term "garage operations" is not qualified or modified.  Elsewhere in the Acceptance Indemnity policy, coverage is provided specifically for injuries resulting from "*your*"—defined as the named insured's—garage operations.  For example, the provision providing "garagekeepers" coverage states:

> We will pay all sums the "insured" legally must pay as damages for "loss" to a covered "auto" or "auto" equipment left in the "insured's" care while the "insured" is attending, servicing, repairing, parking[,] or storing it in *your* "garage operations" . . . .[31]

Similarly, an "insured" under the policy excludes, *inter alia*:

> [s]omeone using a covered "auto" while he or she is working in a business of selling, repairing, parking[,] or storing "autos" unless that business is *your* "garage operations."[32]

Another provision also suggests a distinction between "garage operations" generally and the named insured's garage operations.  The provision excluding coverage for watercraft or aircraft states that coverage is excluded for "[a]ny watercraft or aircraft except watercraft while ashore on premises where *you conduct* 'garage operations.'"[33]

Defendants argue that in order to give effect to each word of these provisions,

---

[30]   Defendants' Reply [Doc. # 109], Exh. D: "Commercial Auto Coverage Part-Garage Policy, No. CG00031677," at 2.

[31]   *Id.* at 7 (emphasis added).

[32]   *Id.* at 3 (emphasis added).

[33]   *Id.* at 5 (emphasis added).

the provision at issue in this case must be interpreted to afford coverage for a bodily injury resulting from "garage operations," regardless whether they are the garage operations of the named insured.  Acceptance Indemnity offers no alternative reading of these provisions that accounts for the distinction between garage operations generally and the garage operations of the named insured.  Instead, Acceptance Indemnity argues that to require coverage for injuries resulting from garage operations generally would "lead to absurd consequences, making the insurance carrier potentially responsible for accidents that had nothing to do with the 'garage operations' of the named insured."[34]  This argument is unpersuasive.

First, the Court cannot "rewrite agreements to insert provisions the parties could have included."  *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) (citing *Great Am. Ins. Co. v. Langdeau*, 379 S.W.2d 62, 65 (Tex. 1964); *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (Tex. 1911)).  The use of the possessive "your" in some provisions but not others demands that the provisions be interpreted differently.  If this was not Acceptance Indemnity's intent, the company could easily have anticipated this issue and drafted the policy accordingly.

Second, the conflicting interpretations advanced by Acceptance Indemnity and Defendants largely amount to distinctions without a difference.  As Defendants point

---

[34]    *See* Plaintiff's Response to Motion for Entry of Judgment [Doc. # 107], at 12.

out, the provision does not purport to provide coverage for *any* accident resulting from *any* garage operations.  Instead, the provision is narrowly tailored to afford coverage only where the insured is found *legally liable* for a "bodily injury" caused by an "accident" resulting from "garage operations," as the operative terms are defined by the policy.   The Court can conceive of very few situations where a named insured could be found legally liable for an accident that did not result from its own garage operations.  Indeed, as discussed in the next section, liability by virtue of the SBE doctrine—one such situation where liability may potentially be assessed against a named insured for an accident not resulting from its own garage operations—is precluded by public policy.

Accordingly, the Court finds this policy language unambiguous.  To the extent there is any ambiguity, it must be construed against the drafter and in favor of coverage.  *See Guaranty Nat'l Ins. Co. v. Azrock Indus., Inc.*, 211 F.3d 239, 243 (5th Cir. 2000); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987).  Thus, where an insured is deemed legally liable for damages for accidental bodily injury resulting from "garage operations," as defined by the policy, the policy potentially provides coverage.

**B.      Insurance Coverage for "All Sums an 'Insured' *Legally Must Pay* as Damages":  Indemnity of SBE Entities**

Even though the Acceptance Indemnity policy does not require a finding than

an injury resulted from the garage operations of the named insured, it does require that the named insured be found directly liable for a covered injury.  The jury finding that Maltez was not employed by AAI at the time of his accident squarely presents the question whether an insurer must indemnify a judgment rendered against a named insured that is premised solely on a finding that the named insured operated as an SBE with an entity that was held liable for the judgment.   Because requiring indemnification on such facts does not comport with the language and meaning of the policy, and because it would create perverse incentives and contravene public policy, the Court concludes that Acceptance Indemnity is not required to indemnify AAI for payments under the state court judgment.

As a federal court sitting in diversity, the Court must make an "*Erie* guess" about how the Texas Supreme Court would apply the SBE doctrine in the circumstances presented here.  *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938); *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 478 (5th Cir. 2000); *United States v. Johnson*, 160 F.3d 1061, 1063 (5th Cir. 1998).  "In the absence of Texas Supreme Court pronouncements, [the federal court will] generally defer to the holdings of lesser state courts unless [it is] convinced by other evidence that the state law is otherwise." *Hamilton*, 232 F.3d at 479 (citing *Johnson*, 160 F.3d at 1063).

The SBE doctrine itself has not been endorsed by the Texas Supreme Court, and its vitality remains somewhat uncertain.  *See So. Union Co. v. City of Edinburg*, 129

S.W.3d 74, 87 (Tex. 2003); *see also Carlson Mfg., Inc. v. Smith*, 179 S.W.3d 688, 694 (Tex. App.—Beaumont 2003, no pet.) (Although "several intermediate [Texas] courts . . . have recognized a concept of 'single business enterprise' in one context or another . . . the [Texas] Supreme Court has thus far reserved ruling on the issue.").  Because the doctrine has been recognized by certain intermediate Texas state courts, however, this Court deems the doctrine generally valid under Texas law.

As the Court discussed in its October 3, 2007 Memorandum and Order ("October Memorandum") [Doc. # 61] denying summary judgment, the SBE doctrine exists as an "equitable veil-piercing theory" by which "'each constituent corporation [may be held] liable for the debts and liabilities incurred in the common enterprise.'" *De La Hoya v. Coldwell Banker Mex., Inc.*, 125 F. App'x 533, 536–37 (5th Cir. 2005) (quoting *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 120 (Tex. App—Beaumont 2001, pet. denied)).  Its purpose, "like the alter ego theory and other doctrines designed to pierce the corporate veil, is to prevent an inequitable result," such as where a business entity seeks to hide behind complicated corporate structures to avoid liability for its wrongs.  *Carlson Mfg. v. Smith*, 179 S.W.3d 688, 694 (Tex. App—Beaumont 2005, no pet.).  Thus, Texas courts have permitted collection of a debt from a member of an SBE upon a finding that the constituents "integrate[d] their resources to achieve a common business purpose," and incurred debt in pursuit of that purpose.  *Old Republic Ins. Co. v. EX-IM Servs. Corp.*, 920 S.W.2d 393, 396 (Tex.

App.—Houston [1st Dist.] 1996, no writ); *see also Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 150 S.W.3d 718 (Tex. App.—Austin 2004, pet. granted). A finding that two or more entities operated as an SBE permits recovery, jointly and severally, against one entity for the debts and liabilities of another. *See Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *see also Hall v. Timmons*, 987 S.W.2d 948 (Tex. App.—Beaumont 1999, pet. denied); *Superior Derrick Servs., Inc. v. Anderson*, 831 S.W.2d 868 (Tex. App.—Houston [14th Dist.] 1992, writ denied ); *Hideca Petroleum Corp. v. Tampimex Oil Int'l, Ltd.*, 740 S.W.2d 838 (Tex. App.—Houston [1st Dist.] 1987, no writ).

Unlike other veil-piercing theories, the SBE doctrine does not require a finding of actual fraud in order to expand liability. *See, e.g.*, *Nat'l Plan Adm'rs*, 150 S.W.3d at 744–47; *N. Am. Van Lines,* 50 S.W.3d at 120–21; *Paramount Petroleum Corp.*, 712 S.W.2d at 536. Instead, the doctrine requires only that a fact-finder consider a variety of factors to conclude that certain entities did not operate separately, but instead integrated their resources to achieve a common business purpose.[35] *See Hoffmann v.*

---

[35] These factors include whether the entities had common employees, common offices, centralized accounting, payment of wages by one corporation to another corporation's employees, common business name, services rendered by the employees of one corporation on behalf of another corporation, undocumented transfers of funds between corporations, and unclear allocation of profits and losses between corporations. *Paramount Petroleum Corp.*, 712 S.W.2d at 536.

*Dandurand*, 180 S.W.3d 340, 348 (Tex. App.—Dallas 2005, no pet. h.).  While the precise limits of the doctrine differ from other veil-piercing theories, such as "alter ego," the SBE doctrine is conceptually similar.  *See Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986).  Policies and patterns of Texas courts in the veil-piercing context are therefore informative in assessing the reach of the SBE doctrine.

Texas courts are reluctant to pierce the corporate veil and expand liability except in "compelling circumstances."  *Robbins v. Robbins*, 727 S.W.2d 743, 746 (Tex. App. —Eastland 1987, ref. n.r.e.).  Moreover, Texas law expresses more reluctance to apply veil-piercing theories in contract cases, as compared to tort cases, the notion being that one who is tortiously injured does not choose his tortfeasor, while contracting parties enjoy "the element of choice inherent in a contractual relationship."  *Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193, 195 (5th Cir. 1983).  Indeed, after the Texas Supreme Court appeared to discard the traditional distinction between tort and contract in the context of corporate veil-piercing, *see Castleberry*, 721 S.W.2d 270, the Texas legislature responded, and now requires a showing of actual fraud in order to pierce the corporate veil in a breach of contract case.  TEX. BUS. ORGS. CODE § 21.233 (Vernon Supp. 2006)[36]; *see* TEX. BUS. CORP. ACT art.

---

[36]   This provision insulates corporate shareholders from "liability to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from a contractual obligation . . . unless the obligee demonstrates that the [shareholder] caused the corporation to be used for the purpose
(continued...)

2.21—repealed eff. Jan. 1, 2010; *see also De la Hoya*, 125 F. App'x at 538–41; *So. Union Co.*, 129 S.W.3d at 86–87 (reserving judgment on whether the SBE doctrine "is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure and the theories of joint venture, joint enterprise, or partnership for imposing joint and several liability," but stressing that the court "said nothing [in earlier cases] to indicate that a 'single business enterprise' theory could be used to view the contracts of distinct corporations as the contracts of a single, amalgamated entity").

Since the Court last issued an opinion on this subject in this case,[37] a Texas Court of Appeals has considered the SBE doctrine in the context of insurance coverage. *KB Home v. Employers Mut. Cas. Co.*, No. 2-06-383-CV, 2008 Tex. App. LEXIS 771 (Fort Worth Jan. 31, 2008, no pet. h.). The *KB Home* Court confirmed the limited reach of the doctrine, concluding that it has "nothing to do with insurance coverage and . . . everything to do with businesses joining together to achieve a purpose and then seeking to avoid debts or judgments incurred in that purpose." *Id.* at *10. Indeed, with regard to insurance coverage, the Texas Court of Appeals made

---

[36]     (...continued)
of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the  holder . . . ." TEX. BUS. ORGS. CODE § 21.233(a)(2), (b).

[37]     *See* October Memorandum [Doc. # 61].

clear that SBE entities who are not named insureds under a policy cannot be considered insureds merely by virtue of an SBE relationship. *Id.* at \*10–\*11. "The fact that one non-insured entity is . . . sued for the actions of another insured entity does not magically metamorphose a non-insured into an insured. This is a logic-challenged idea." *Id.* at \*9. Indeed, nowhere is that more clear than in the context of insurance. "An insurance company assesses risks and issues a policy to a named insured and not to unnamed insureds over whom it has no control, including those who may join in an enterprise with the named insured or who may become indistinguishable from the named insured." *Id.* at \*10.

This reasoning is persuasive. While it is one thing to assign liability for a debt to a member of an SBE upon a finding that the constituents "integrate[d] their resources to achieve a common business purpose" and incurred debt in pursuit of that purpose, *Old Republic Ins. Co.*, 920 S.W.2d at 396, it is another to require that a third party be required to perform on a contract with a company with which he never intended to do business. Indeed, Acceptance Indemnity has argued that it should not be required to provide insurance coverage for an entity that was not named on the AAI policy and for which risk was not considered during the underwriting process. Defendants counter that Acceptance Indemnity has admitted to using a "one-size-fits-all" policy for every state in which it sells garage operations policies and, thus, that it did not actually assess risks when issuing a policy to AAI. Accordingly, Defendants

argue that a holding in Acceptance Indemnity's favor is unwarranted and would "encourage insurance companies to deny coverage merely by making a colorable argument that they did not consider the specific cause of action that formed the basis of liability against its insured."[38]  This argument is unavailing.

Defendants' position that Acceptance Indemnity did not engage in any risk assessment with regard to the AAI policy is not supported by the record.  The claims adjuster for the claim at issue in this case testified that while Acceptance Indemnity uses a standard coverage form—consistent with that used by innumerable insurance companies throughout the country—it adds state-specific endorsements to take into account differences in the law among the thirty to forty states in which it issues garage policies.[39]  In addition, to the extent Acceptance Indemnity's claims adjuster even had knowledge of the underwriting process, he testified that premiums are based, in part, on an assessment of the law of the state of the insured[40] and on assessments of the types of risks presented by the potential insured.[41]

---

[38]     Defendant's Reply [Doc. # 109], at 19–20.

[39]     *See id.*, Exh. E: "Deposition of Dave Collier," at 30–40; *see e.g.*, Plaintiff's Motion for Summary Judgment [Doc. # 41], Exh. A: "Commercial Auto Coverage Part-Garage Policy, No. CG00031677," at 53, 85–89.  (This document is not separately paginated.  All references are to the page numbers assigned by the Court's electronic docketing system.)

[40]     *Id.* at 42–43.

[41]     *Id.* at 83, 89, 90.

Although the record does not disclose with any specificity the underwriting process engaged in by Acceptance Indemnity when it drafted AAI's insurance policy, noticeably absent from the Policy, which was executed in June 2003, is any reference to "Associated Automotive Salvage," which Defendants claim was purchased from AAI and began operation as a distinct business in May 2003.[42]  Given that Defendants have made clear that AAI, the named insured, was not itself involved in salvage activities,[43] there is little to suggest that Acceptance Indemnity contemplated that it was entering into a contract with Salvage when it executed the Policy with AAI or that it intended to insure risks associated with a salvage business.  Nonetheless, because neither party briefed or sought findings at trial regarding Acceptance Indemnity's underwriting process, the parties' unsubstantiated assertions and the Court's suppositions on this matter are not alone dispositive on the question of Acceptance Indemnity's obligations to AAI.

Defendants next argue that Acceptance Indemnity could have drafted its policy to make clear that liability by virtue of an SBE finding was not covered.  Defendants argue that, notwithstanding the Texas Court of Appeals discussion in *KB Home*, Acceptance Indemnity is obligated to indemnify for any damages AAI "legally must

---

[42]    *See* Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment [Doc. # 44], at 4–6.

[43]    *See id.*, Exh. D: "Deposition of Cal Enderli, Sr.," at 31.

pay as damages," regardless of how that legal obligation arises.  Although any insurer is well advised to craft thoughtful, unambiguous insurance contracts, Acceptance Indemnity cannot be faulted for failing to anticipate a legal question, premised on an uncertain legal doctrine, that has never come before the Texas courts.  In fact, the Court's research has failed to turn up a single case in the entire country dealing with this question.  The "legally obligated to pay" language unambiguously refers to obligations that are assessed against a named insured due to that insured's activities or omissions.  This conclusion is premised both on the plain language of the text, read in context of the policy as a whole, and because the reading advanced by Defendants leads to results that are contrary to public policy.  *See Calcasieu-Maine Nat'l Bank v. Am. Employers' Ins.* Co., 533 F.2d 290, 295 (5th Cir. 1977) ("[C]ourts ought not strain to find . . . ambiguities, if, in so doing, they defeat probable intentions of the parties. . . . This is so even when the result is an apparently harsh consequence to the insured.).

First, the relevant provision of AAI's policy states that Acceptance Indemnity "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' . . . to which this insurance applies caused by an 'accident' and resulting from 'garage operations . . . .'"[44]  Defendants argue that the failure of this provision to state that

---

[44]     Defendants' Reply [Doc. # 109], Exh. D: "Commercial Auto Coverage Part-Garage
(continued...)

Acceptance Indemnity will pay all sums an insured "legally must pay due to the insured's negligence or wrongful act," implies that the policy does not require acts or omissions by AAI to trigger indemnification.  Accordingly, Defendants argue that this provision demands coverage even when liability is assessed only by virtue of a novel and untested legal theory.  Defendants' argument is unpersuasive.  The provision does not merely state that the insurance company will cover *any* legal liability assessed against AAI.  Instead, it qualifies the "legally must pay" language by insisting that the liability be assessed against a named insured and arise due to accidental bodily injury resulting from garage operations.  Acceptance Indemnity's claims adjuster testified that inherent in this provision is the common sense notion that legal liability for accidental injuries occurring in the course of an insured's business only results upon a finding that the named insured engaged, or failed to engage, in actionable conduct.[45] Given that the SBE doctrine is recognized to some degree in only a handful of jurisdictions,[46] and that neither the parties, nor the Court, have identified a single instance where the doctrine has been advanced as a rationale for expanding

---

[44]   (...continued)
Policy, No. CG00031677," at 2.

[45]   *See id.*, Exh. E: "Deposition of Dave Collier," at 49–51.

[46]   *See* Stephen B. Presser, *The* Bogalusa *Explosion, "Single Business Enterprise," "Alter Ego," and Other Errors: Academics, Economics, Democracy, and Shareholder Limited Liability: Back Towards a Unitary "Abuse" Theory of Piercing the Corporate Veil*, 100 Nw. U. L. Rev. 405, 422–23 (2006).

indemnification obligations of an insurer, the Court agrees with the company's reading of this provision. The provision is worded to provide coverage only where legal liability is assessed directly against a named insured, due to the insured's activities or omissions.

Second, and more significantly, a careful consideration of the consequences of Defendants' reading of this provision confirms the Court's interpretation of the policy language and demonstrates that Defendants' interpretation is contrary to public policy. Texas law has long recognized that "[t]he foundation of insurance is . . . risk distribution, and premiums are a function of calculated risk." *In re Tex. Ass'n of Sch. Bds., Inc.*, 169 S.W.3d 653, 659 (Tex. 2005) (citing 1 COUCH, ENCYCLOPEDIA OF INSURANCE LAW § 1.3 (2d ed. 1959)). "The payment of the premium by the insured and the assumption of a *specified risk* by the insurer are the essential elements of the contract for insurance. *Id.* at 658 (emphasis added). To require an insurer to provide coverage for unknown risks assumed by an unlimited number of additional entities with which a named insured may choose to do business—either before or after entering into the insurance contract—would destroy this fundamental basis of the underwriting process. In addition, such a regime would allow businesses engaged in high-risk activities to avoid the burdens of paying costly insurance premiums by permitting them to operate as separate business entities, obtain insurance only for those entities engaged in low-risk activities, and then seek insurance coverage for the

high-risk ventures by virtue of the SBE doctrine.  This use of the doctrine would create chaos in the insurance industry, by upsetting principles of risk assumption—which are key in the context of insurance—and would encourage uninsured entities to deflect liability for their own wrongs without paying insurance premiums or subjecting themselves to meaningful and necessary underwriting process. Accordingly, the Court predicts that the Texas Supreme Court would find this use of the SBE doctrine contrary to public policy.

In addition, it is important to note the context presented here.  In Texas, an employer is not required to purchase workers' compensation insurance. *See Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 658 (Tex. 2008).  However, those that do purchase coverage benefit from a strict statutory and regulatory regime that "protects an employer from an employee's common law claims for injuries or death occurring during the course and scope of the employee's work responsibilities . . . ." *Id.*  Employers who chose to forego workers' compensation insurance assume the risk of incurring legal liability for workplace injuries.  *See Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs.*, 236 S.W.3d 190, 199 (Tex. 2007).  In this case, there is no evidence that either AAI or Salvage obtained workers' compensation insurance and there is no doubt that the Acceptance Indemnity policy at issue is expressly *not* a workers' compensation policy.  To rule in Defendants' favor and require Acceptance Indemnity to pay Maltez's state court judgment would be to

convert AAI's general liability insurance policy—for which AAI paid premiums commensurate with the risks assumed by Acceptance Indemnity—into Salvage's workers' compensation policy—for which no premiums were calculated or paid. To permit such an outcome would be contrary to common sense and public policy.

Ultimately, Defendants' legal maneuvering is an attempt to fit a square peg into a round hole. Salvage did not obtain insurance to cover Maltez's workplace injury and the Court predicts that the Texas Supreme Court would not countenance Defendants' attempt, through the strained application of the SBE doctrine advanced here, to obtain a free ride on the coverage provided to AAI. Thus, Defendants have failed to meet their burden of proving the existence of coverage under the AAI policy. *See United Nat. Ins. Co.*, 497 F.3d at 448. Accordingly, Defendants' Motion for Entry of Judgment is denied.

### C.   **The Employee Exclusion and the SBE Doctrine**

One final argument raised by Acceptance Indemnity requires discussion. Acceptance Indemnity argues that the finding that Maltez was employed by Salvage, and that Salvage operated as an SBE with AAI, compels a finding that Maltez was employed by the SBE and hence, that the employee exclusion negates coverage under the AAI policy. The Court declines to adopt this reasoning. As noted in the October Memorandum, an SBE is not to be considered a new legal entity, separate and apart

from its constituents.[47]   Accordingly, employees of one SBE entity cannot, solely by

virtue of an SBE finding, be considered employees of another.  This is especially

apparent for insurance purposes.  Acceptance Indemnity's position would create the

very incentives, and permit similar consequences, as would use of the SBE doctrine

to expand an insurer's indemnification obligations.  Namely, it would permit a

company to splinter off its high risk operations, obtain workers' compensation

insurance only for its lower risk entities, and then use the SBE doctrine to obtain

coverage in the event of an employee accident at the high risk operation.  There is no

evidence that the Texas Supreme Court would adopt reasoning that would permit such

a result.

Acceptance Indemnity's reliance on *Bedrock Gen. Contractors, Inc. v. Tex.*

*Workers' Compensation Ins. Fund*, No. 03-00-00426-CV, 2001 Tex. App. LEXIS

1468 (Austin March 8, 2001, pet. denied), does not change this conclusion. Contrary

to Acceptance Indemnity's assertion, that case does not stand for the proposition that

a employees of one SBE entity are necessarily employees of all others.  Instead, that

case involved findings that the employees at issue were jointly employed by both SBE

entities, as demonstrated by the control exercised over the employees by each entity,

and in light of state law governing employment relationships in the construction

---

[47]     *See* October Memorandum [Doc. # 61], at 11–15.

industry.  *See id.*, at *5–*10.  Accordingly, given that the jury specifically found that Maltez was *not* an employee of AAI at the time of his accident, the employee exclusion of the Acceptance Indemnity policy is inapplicable to this case.

## IV.   CONCLUSION AND ORDER

After a careful review of the evidence presented at trial, the Court concludes that there is insufficient evidence to support the jury's third finding that Maltez's August 2003 injury resulted from AAI's garage operations.  However, interpreting the relevant provision of the Acceptance Indemnity insurance policy in the context of the policy as a whole, the Court concludes that coverage for an accidental bodily injury does not require that the injury result from the garage operations of the named insured, AAI.

Defendants nevertheless are not entitled to indemnity because the Court also concludes that coverage under the policy is not triggered unless the named insured is deemed legally liable for an accidental bodily injury resulting from garage operations due to the named insured's activities or omissions.  Liability assessed against a named insured solely by virtue of the SBE doctrine is insufficient to trigger Acceptance Indemnity's duty to indemnify.  Therefore, it is

**ORDERED** that Defendants' Motion for Entry of Judgment [Doc. # 100] is **DENIED**.  It is further

**ORDERED** that, because Acceptance Indemnity is under no duty to indemnify

AAI in this matter, it is not in breach of its insurance agreement with AAI, and

Defendants are not entitled to attorneys' fees.

A separate final judgment in Acceptance Indemnity's favor will be entered.

SIGNED at Houston, Texas this **30<u>th</u>** day of **April, 2008**.

Nancy F. Atlas
United States District Judge